Cramer et al. *v.* Reford.

GEORGE CRAMER and EDWARD PIERSON *vs.* JAMES A. REFORD and ANN, his wife.

GEORGE S. CORWIN *vs.* SAME DEFENDANTS.

JOHN F. VOORHEES *vs.* JAMES A. REFORD and wife, and others.*

JOHN C. DOREMUS *vs.* JAMES A. REFORD and wife, and others.

1. The wife's earnings, and the avails of her labor, during coverture, belong to her husband, and he cannot, as against his creditors, give, or agree to give, them to her.

2. Real estate purchased with the wife's earnings, during coverture, belong to the husband, and is subject to be taken for his debts.

3. A conveyance, in view of future indebtedness, and with an intent to place the property beyond the reach of creditors, is fraudulent, as against creditors, and will be set aside.

4. A husband cannot testify in favor of his wife in a civil suit in which she is a party.

These cases were argued together, by consent, before J. Wilson, esq., sitting for the Chancellor.

*Mr. H. C. Pitney,* for all complainants.

Were Reford and wife competent witnesses?

1. The legal title is in Mrs. Reford. The bill is filed to avoid her title. Her husband cannot be sworn as a witness for her. *Bird* v. *Davis,* 1 *McCarter* 467.

2. Mr. Reford was not a mere formal party. He is the debtor, and the allegation is that the property is his, and there must be a decree against him.

The same principle that excludes the husband from swearing for the wife, excludes the wife from swearing for the husband.

* 1 McCarter 155.

The complainants, though sworn, confined their testimony to matters strictly within § 27, *Nix. Dig.* 928.

Again, the husband being incompetent, the complainants were incompetent, and the complainants being incompetent, it follows that the wife is also incompetent. *Nix. Dig.* 928, § 34.

It follows that neither the deposition of Mr. or Mrs. Reford should be read.

I shall consider the case as if both depositions were read.

As to the merits. Complainants ask conveyances to be set aside as fraudulent, and the land in question subjected to the lien of their judgments and sold to pay them, on three grounds.

*First.* The debt upon which Corwin's judgment is founded, arose prior to the conveyances.

*Second.* Reford was indebted, on the 25th of March, 1858, (the date of the deed,) to John Henry Ehlers, in about $100; to the church, for a pew bought, in the sum of $90; and to the Newark City Bank for $500, on a note made by James W. Crane, indorsed by Reford, Ehlers and Simeon Baldwin, and which was an accommodation note got up to raise money for Reford to start business. The execution and delivery of the deeds made him insolvent. Before the actual delivery of the deeds he became largely indebted to divers other persons.

*Third.* The deeds were made in contemplation of future indebtedness, and the case is within the principle of *Beeckman* v. *Montgomery*, 1 *McCarter* 106; *Belford* v. *Crane*, 1 *C. E. Green* 265.

I. Corwin's claim consists mainly of a note of $540, given by Reford to one Kay, for rent of Pocahontas paper mill, and which note Corwin indorsed, at Reford's request, and for his accommodation, and was obliged to pay. Reford was insolvent. It is so alleged in Corwin's bill, and admitted in the answer, or not denied. Corwin claims that this note stands in place of the rent, and that the judgment upon it is to be considered here in equity, and for the purpose of this suit, as if it had been recovered upon the *lease itself*, and that the

debt represented by that judgment *originated* when the contract to rent was entered into.

This position rests upon the familiar principle of *subrogation* or *substitution*, which obtains where a surety pays a debt for his *principal*.

Corwin was surety for the rent, and his position in this suit is the same as would be that of Kay, the lessor, if he had recovered judgment on the lease. *Dias* v. *Bouchard*, 3 *Edw. Ch. R.* 485. In that case the complainants had paid government duties for a party who failed and made an assignment, and filed their bill in equity against the assignee, claiming to stand in place of the United States, and have priority of payment of their debt, and it was so allowed. See also *Eddy* v. *Travers*, 6 *Paige* 521.

In *Lidderdale's Ex'rs* v. *Robinson's Ex'r*, 12 *Wheat.* 594, it was held that under the statute of Virginia, giving to debts due upon *protested bills of exchange* the rank of judgment debts, a joint indorser who has paid more than his share of the debt, has a right to satisfaction out of the assets of his co-indorser, with the priority of a judgment debtor. See reasoning of *Johnson, J., page* 596.

I cite also *Burrows et al.* v. *Carnes' Adm'rs*, 1 *Desaus.* 409, which was a case of payment and satisfaction of record of a judgment against a surety, and the judgment was revived; also *Ex'rs of Wayles* v. *Randolph*, 2 *Call* 125, a case of payment of a bond by a surety, without assignment, and bill by him claiming standing of a *specialty creditor*, and so *held*.

The English cases do not go quite so far in this direction as the American cases, but the practical result is the same. The case of *Copis* v. *Middleton*, 1 *Turner & Russell* 224, is cited by Story as restraining the rule. But he admits the American cases are mainly the other way. 1 *Story's Eq. Jur.*, § 493, *note;* § 499 *b, and note*, where Justice Story says *Copis* v. *Middleton* is not followed in America; § 499 *c*; § 500, 501, 502; *Robinson* v. *Wilson*, 2 *Madd.* 569.

In this case now before the court, the debt is the same;

its form only is changed. It is not a question of *specialty*, or *simple contract*, or *judgment;* not a question of *character*, but of *origin.*

When did the debt for which Reford gave the note in question arise? Clearly, when he entered into the contract to lease the paper mill. The obligation he then entered into, has never been discharged by him. He cannot claim that he has paid it; as to him, it is unpaid.

Corwin's position in this suit, is precisely the same as if judgment had been recovered upon the lease itself. What then is the date of the origin of this debt? The rent accrued between October 1st, 1858, and April 1st, 1859, but the lease is dated April 1st, 1858, and the covenant to pay this rent was then made. It was "*debitum in præsenti, solvendum in futuro.*"

It is not necessary for the purposes of this case, to go as far as the cases have gone. *Man* v. *Rainsborough*, 2 *Keble* 99; *Twyne's case*, 3 *Coke* 82; *Jackson* v. *Myers*, 18 *Johns. R.* 426; *Jackson* v. *Mather*, 7 *Cowen* 301; *Jackson* v. *Seward*, 5 *Cowen* 67; *Roberts on Frauds*, 455, 459.

The lease is dated April 1st, 1858, and we contend that it is sufficient for our purpose at that date.

The deed to the son, J. Banks Reford, is dated March 25th, 1858; certificate of acknowledgment, May 1st, 1858; recorded May 17th, 1858. Mr. McDonald swears that the deed was left in his hands, as an *escrow*, to be delivered to the grantee when his wife should acknowledge it. *It was actually delivered May 4th*, 1858. That is the first that the son, or anybody for him, had the deed. There was no delivery *in law*, until that day, May 4th, 1858. As to creditors and all the world, there was no transfer until May 17th, 1858, the day it was lodged for record.

There being no change of possession, the registry of deeds was the only notice the public had of the change of title. If these positions are correct, there is an end of the case.

James A. Reford was in full possession, as absolute owner,

for seven weeks after the date of the lease, and then settled the property on his wife, without consideration. Under the uniform rule of equity, in such cases, the settlement must be set aside. *Reade* v. *Livingston*, 3 *Johns. Ch. R.* 500; *Cook* v. *Johnson*, 1 *Beas.* 51.

But we are able to trace the origin of this debt further back than April 1, 1858, the date of the lease. *The contract to enter into the lease was made about February 25th, 1858.* *Reford answered Kay's letter of February 25th, 1858,* and then a valid contract was made. Reford says he considered himself bound February 23d, 1858. He was then insolvent.

A contract to take a lease is as well known to the law, and to equity, as the lease itself. In equity, the title changes when the preliminary contract is made, as well in contracts to lease as in contracts to purchase.

On a question of *origin* or *nativity*, we go back to the first agreement or understanding.

This view of the case takes us entirely back of the conveyance in point of time, and makes it conclusively fraudulent, as to Corwin's debt; and being set aside as to him, all the other judgment creditors come in, unless Mrs. Reford's defence puts her in the position of a purchaser for value.

II. Indebtedness, at the date of the settlement, to other parties.

At the date of the deed, Reford owed some $700, besides the debts incurred in the purchase of stock for the mill.

According to the English practice, these concurrent debts to third parties, are sufficient to set aside the conveyance as to subsequent creditors, provided they are considerable, and the settlement include all, or nearly all, the grantor's property. *Lush* v. *Wilkinson*, 5 *Vesey* 387; *Kidney* v. *Coussmaker*, 12 *Ibid.* 155; *Townshend* v. *Windham*, 2 *Ibid.* 10; *Townsend* v. *Westacott*, 2 *Beav.* 345; *S. C.*, 4 *Beav.* 58; *Richardson* v. *Smallweed*, *Jacob* 556, 557, *and note.*

In this case before the court, the settlement covered every

particle of the grantor's property, and left him nothing.    He became thereby absolutely insolvent.    His insolvent examination shows he had no personal property.

All the cases show that if the grantor was insolvent, subsequent creditors may avoid the settlement.    The evidence proves, conclusively, that Reford's circumstances never improved, but that his embarrassments increased until final failure.

*Whittington* v. *Jennings*, 6 *Simons* 493, is direct authority to sustain the bills of *Cramer & Co.* and *Voorhees*, upon the strength of Reford's concurrent indebtedness to them.

True, Reford did on one occasion settle with these complainants, and give his notes in payment, but he continued to purchase on credit, and was never out of their debt.    In general a mere substitution of a new debt for an old, is no payment.    *Richardson* v. *Smallweed, Jacob* 552; *Mills* v. *Morris, Hoffman's Ch. R.* 420; *Botts* v. *Cozine, Ibid.* 86; *Sexton* v. *Wheaton,* 8 *Wheat.* 229, 246.

If any one of these complainants succeeds in establishing his own case, independent of the others, the others come in.    1 *Story's Eq.,* § 355–365, *inclusive; Ede* v. *Knowles,* 2 *Younge & Coll.* 172; *Townsend* v. *Westacott,* 2 *Beav.* 345; *Reade* v. *Livingston,* 3 *Johns. Ch. R.* 500; *Cook* v. *Johnson,* 1 *Beas.* 51; *Wickes* v. *Clarke,* 8 *Paige* 160, 165.

III. But this case may be put upon broader grounds. The settlement was made in contemplation of future indebtedness, and to protect the property against the risks of business.    It is, therefore, actually fraudulent and void, as to all creditors.

1. It was a settlement of his whole estate, and was not a *fair* and *reasonable* one.    The *quantum* of the settlement, as compared with the total value of the grantor's estate, is always taken into consideration.    1 *Story's Eq. Jur.,* § 358, 362; *Hinde's Lessee* v. *Longworth,* 11 *Wheat.* 199.

2. Reford remained in possession.    The *apparent* ownership was unchanged.

3. It was made directly to his wife, without intervention of trustees.

4. It was made at a moment when the grantor was just entering into an extensive and hazardous business and undertaking.

5. Ehler's testimony *proves actual fraud.* It shows that the conveyance was made for the express purpose of putting the property beyond the contingencies of future business transactions. His evidence is denied by Reford and wife, but it is submitted that he appears, upon the whole case, to be the more reliable witness.

6. Reford gained credit on the ownership of this property after the settlement, thereby showing that he had actual fraudulent intentions in settling it. He meant to gain credit as owner, without risking the property.

These several badges of fraud must be sufficient to satisfy the court that this settlement is tainted with *actual fraud,* and is void as to subsequent creditors.

What is the defense ?

1. Money consideration passing between father and son.

2. That the settlement was made in pursuance of a previous agreement that it should be the wife's, because she had worked and helped pay for it.

This defense is substantially the same set up and insisted upon in *Belford* v. *Crane,* 1 *C. E. Green* 265, and decided adversely to the defendant.

A distinction may be attempted to be made between that case and the one before the court, because this latter sets up an *agreement* between husband and wife, that the property should be hers, made concurrently with the original purchase.

To which I answer:

1. The existence of the alleged agreement rests entirely on the evidence of the defendants.

Their daughter, Grace, was sworn, and says nothing about it. She lived in the family all the time. The other children also lived at home. Not one is called to prove the agree-

ment. Ehler's testimony shows that nothing was said about prior agreement, when the deed was decided upon.

2. The agreement itself, as alleged and proven, is *vague, uncertain,* and insufficient to found an equity upon. It is no agreement.

3. The amount alleged to have been contributed by the wife is not proven. No account was kept. The evidence does not warrant the belief that she contributed enough to pay for it.

The burthen of proof is on the wife to prove the agreement, and that the money came to her by descent, devise, or gift, and not from her husband. *Gamber* v. *Gamber,* 6 *Harris* 366.

4. The property was actually paid for by the husband, with his own earnings.

5. The earnings of the wife belong to the husband. *Reeve's Dom. Rel.* 61, 68; *Switzer* v. *Valentine,* 4 *Duer* 96; *Freeman* v. *Orser,* 5 *Duer* 476; *Baringer* v. *Stiver,* 13 *Am. Law Reg.* 559, and cases there cited; *Gamber* v. *Gamber,* 6 *Harris* 366; *Raybold* v. *Raybold,* 8 *Harris* 311; *Keeney* v. *Good,* 9 *Harris* 349; *Belford* v. *Crane,* 1 *C. E. Green* 265.

The case before the court is distinguishable from the case of a wife engaging in some special trade, business, and occupation, where her profits and earnings are kept separate, and invested in a stock in trade.

In this case the wife simply attended to her ordinary household duties, kept cows and sold milk, &c., and boarded her own children when they could work and pay board. It is a simple case of a thrifty housewife claiming compensation for services as a wife, to be paid ten-fold against creditors.

This house and lot should be sold, and out of the proceeds payment decreed to complainants for the amount due on their several judgments.

John C. Doremus has obtained judgment on his notes, and has filed his bill (in the same form as Voorhees' bill) against all these parties. A decree *pro confesso* is entered against all, and the case is set down for hearing *ex parte,* at this term.

He should be included in the decree, and participate in the relief.

*Mr. McDonald,* for Reford and wife.

The claims involved in this argument are those of subsequent creditors.

The statute of 13 *Elizabeth, ch.* 5, which the statute of New Jersey follows, enacts, that conveyances made with intent to defraud creditors, shall be void, with the proviso, excepting such as are made upon good consideration and *bona fide* to any person not having notice or knowledge of such fraud.

This is supposed to be Mrs. Reford's case. If there was any fraudulent intent on the part of her husband, she was ignorant of it. As far as she was concerned, there was good consideration and *bona fides;* and as between her and her son, there was a valuable consideration, for he paid a debt he owed her, by giving to her a deed for this land.

Lord Mansfield, in *Cowper* 434, assumed that the rules of the common law, as understood in his time, would have attained the same end as to fraudulent conveyances, without the aid of the statute of 13 *Elizabeth,* and judges since his day, have gone so far as to nullify the proviso, which is a part of the statute.

But suppose the transaction to have been purely a voluntary post-nuptial settlement, made by Reford in behalf of his wife; if the conveyance was not made with fraudulent intent, then it is valid against subsequent creditors. *Sexton* v. *Wheaton,* 8 *Wheat.* 229. In this case, Marshall, C. J., declares that a conveyance to a wife is fraudulent as against subsequent creditors, if made for the benefit of the settler, or with a view to being indebted at a future time, *and not because it is voluntary.*

So in *Beeckman* v. *Montgomery,* 1 *McCarter* 112, it is said that where the grantor is free from debt, and there are no circumstances showing that the deed was made with a view

to future indebtedness, it can only be avoided by subsequent creditors, upon proof of actual fraud.

Here the grantor was free from debt, as much so as any man can be, for the court in *Salmon* v. *Bennett*, 1 *Conn.* 558, say, "if any degree of indebtedness, however small, would defeat such conveyances, they would virtually be, *per se*, fraudulent, since no individual perhaps, or, at least, hardly any one in the community, is, at any time, absolutely free from debt. Evidence of indebtedness at the time, amounting or approximating to embarrassment, must be shown." It is true that this conveyance included Reford's whole estate, but what of that? As a badge of fraud, it may be explained. In *Sexton* v. *Wheaton*, the court say, "if a man has a right to make a voluntary settlement of a part of his estate, it is difficult to say how much of it he may settle. In the case of *Stephens* v. *Olive*, the whole estate appears to have been settled, subject to a mortgage of five hundred pounds, yet that settlement was sustained."

In truth, all the circumstances relied on by the complainants, as badges of fraud, indicate no such thing, if we keep constantly in mind the simple fact sworn to in the answers, that the conveyance was only carrying out a long cherished intention of Reford, to settle this very property upon his wife. She had earned it in whole, or in part, as she contended, and wanted the title in her own name. Reford assented, and acknowledged the claim. This may be poor law, in view of the rule that the wife's earnings belong to the husband, but it is anything but fraudulent.

The property in question was conveyed by Bromley's executors to Conger, (for whom Reford worked,) in 1849, and who held it subject to Reford's order until 1856, when Reford, without taking counsel, demanded and received from Conger a deed for it.

The following fall, a small slip of the land was taken off by the surveyors of the highways for a public road, which irritated Mrs. Reford so much, that she demanded that the title should be vested in her.

Suppose that Bromley's executors, in 1849, instead of conveying to Conger, had conveyed to Mrs. Reford, could her title have been put in jeopardy by Reford's taking the Pocahontas mills, in 1858, and becoming insolvent then and there? Certainly not, because the time is too remote and the title never had been in the husband.

But that should make no difference when we come to the question of intention. The motive that produced the deed, was begotten by the intention to carry out the settlement, and not for the purpose of cheating creditors, or with a view to future indebtedness.

THE MASTER. The main point to be determined in these cases is the same, and depends on the same evidence, and they were, by consent of parties, argued together.

The complainants are judgment creditors of the defendant, James A. Reford, and executions, issued upon their respective judgments, have been levied upon a certain house and lot of land, containing about one acre and seventy-five hundredths, situate in Bloomfield township, Essex county, formerly owned in fee by Reford, and by him conveyed to his son, Joseph B. Reford, who conveyed them to the defendant, Ann, wife of said James A. Reford, and she now holds the same.

It is charged by the complainants, that these conveyances are fraudulent and void as against creditors, because, as it is alleged, they were without valuable consideration, and were made with intent to defraud creditors, and while Reford was in debt, and also with a view to his future indebtedness; and the prayer is, that the deeds may be declared fraudulent and void, and the property sold to pay the judgments.

The answer of Reford and wife denies that the conveyances were made with intent to defraud creditors, and states that they were made upon good and valuable consideration, because, as it is alleged, it had been agreed between Reford and his wife, that the property should be hers, when he first bought it, and that the conveyance to her was in pursuance of that agreement, and that she had, during the coverture,

21*

bought cows and poultry, and sold milk and fowls, and received the pay for them; and that she had also boarded her children, who, though they lived at home with their father and made a part of his family, yet worked for other persons and maintained themselves, and that the children had, at different times, made her presents of money, and that it was agreed, between her and her husband, that she should have the money so paid to her in these different ways, in her own right, and appropriate the same to her own use and the support of the family; and that she had expended it in buying furniture and other articles for the family, and also in buying cows, the milk from which she sold as before mentioned; and that without such aid from his children, and the industry of his wife, Reford would have been unable to accumulate the means with which he purchased said house and lot, as his earnings would otherwise have been necessarily expended in the support of his family. The answer admits that, at the time the conveyances were made, Reford was indebted to various persons, but says that those debts have all since been paid. The answer also admits, that the conveyance from Reford to his son, was mainly for the purpose of having the property conveyed to his wife, but says, nevertheless, that Reford was at that time indebted to his son, "about sixty dollars," and that the son was also then in debt to his mother "for board and washing, the amount whereof is not now recollected, and also for some twenty-two or three dollars, money advanced to him by his mother, out of her earnings, for the purpose of purchasing railroad commutation tickets for his own use," and that it was agreed that said conveyances should satisfy and settle such indebtedness. Upon these grounds, it is insisted that said conveyances were made upon good and valuable consideration.

The consideration expressed in the deed from Reford to his son, and also in the deed from the son to his mother, is $1500. But it is admitted that no money, or other thing of value, was, at the time of the conveyance, actually paid or delivered by either party to the other.

The value of the house and lot is, according to the evidence, from $3000 to $4000, and by some of the witnesses is placed still higher. Reford says, in his answer, that he wished to buy the property in 1849, but could not do so then for want of means, and also because a judgment for about $446 was then standing against him and others, his co-defendants, in a suit in the Supreme Court, and that he, therefore, got Mr. Conger, in 1849, to take a deed for it in his own name. Conger continued to hold the property until that judgment was settled, and then, in the year 1856, conveyed the property to Reford, who held it until the spring of 1858, when he conveyed it through his son to his wife.

The conveyance by Reford to his son, must be regarded as only a means used by him to convey the property to his wife, and cannot stand, if the conveyance to her was fraudulent.

Was the conveyance to Mrs. Reford made for a good and valuable consideration? The evidence does not show that she had any property at the time of her marriage, or that she has since acquired any by inheritance, gift, devise, or otherwise, except what she received from the sale of milk and poultry, and from her children for their board, or as presents. It does not appear that she kept any account of the money so received, nor how much it amounted to in all. And it was spent by her, as the answer states, in procuring furniture and other articles for the use of the family. The money given to her as presents by her children, seems to have been inconsiderable in amount, and the testimony in regard to it, is vague and unsatisfactory. The allegation that there was an agreement between her and her husband, to the effect that the money received by her from the different sources before mentioned should be hers, in her own right, is not sustained by the evidence; and if she really took the money as her own separate funds, it was all spent, or nearly so, before the deed was executed to her. She had none then in hand to pay over, and she paid none. But even if such agreement had been made, and even if she had kept

the money as her own, and paid it over as a consideration for the conveyance, it could not avail to sustain this deed, as against the creditors of her husband, under the circumstances of this case. It was in truth his money. The wife's earnings and the avails of her labor, during coverture, belong to her husband, and he cannot, as against his creditors, give or agree to give them to her, nor can she justly claim, that property purchased with them, in her name, is hers, and not subject to be taken for his debts. *Skillman* v. *Skillman*, 2 *Beas.* 403 ; *Belford* v. *Crane*, 1 *C. E. Green*, 265.

I am of opinion, therefore, that the conveyance to Mrs. Reford cannot be sustained upon the ground that it was for a good and valuable consideration.

Is the conveyance void by reason of the indebtedness of Reford at the time of its execution, or because it was made in view of his future indebtedness, as charged by the complainants ?

There is evidence that Reford was at the time of that conveyance in debt to several different persons. Some of those debts, but not all, have since been paid. Among those not paid, is the debt of about $100, due to Ehlers, for teaching his daughters music. For the rent of the Pocahontas mill, (hereinafter mentioned), which accrued from October, 1858, to April, 1859, Reford gave his note, indorsed by Corwin, one of the complainants, at his request, to Mr. Kay, and the note having been duly protested for non-payment, and Corwin becoming fixed as indorser, he was compelled to pay it ; and the sum so paid by him, is a chief part of the claim on which his judgment against Reford was recovered. The complainants insist, and I think correctly, that this should be considered as an indebtedness existing prior to, and at the time of the conveyance to Mrs. Reford. It is a part of the debt, which by the lease, he bound himself to pay. The obligation to pay rested on him before and at the time of the conveyance, though this portion of the rent did not accrue till afterwards. Nor does it make any difference, that Corwin, by paying off the note he had so indorsed, became the

creditor of Reford, in the place of the original payee. The obligation resting upon Reford was not thereby in any wise changed, except as to the person to whom the debt was to be paid.

I will not remark further upon the indebtedness existing at the time of the conveyance, but will consider whether or not it was made in view of future indebtedness.

In the spring of 1858, some time in the latter part of the month of February, Reford commenced a negotiation for a lease of a paper mill, near Morristown, known as the Pocahontas mill, and it was continued through March and down to the first of April, when a lease, dated on that day, was executed between him and John C. Kay, whereby the mill and its appurtenances was leased by Kay to Reford for four years, commencing on that day, at a rent of $960 a year, payable half yearly. Reford was also to pay the taxes, and keep the machinery and premises in as good repair as they then were, and to pay the expense of insuring the mill against loss or damage by fire. The machinery was old, and not in good repair at the time of making the lease. Reford entered into possession under the lease, and ran the mill until about the middle of April, 1859, when he gave it up, and went into business elsewhere. His business, while at the mill, resulted in a loss to him, caused, as he alleged, by an unusual scarcity of water, but said by others to be owing to the machinery being old and out of repair. It is certain, however, that he was unsuccessful, and that while running the mill, he contracted debts which yet remain unpaid, to a considerable amount, and among them are the debts of some of the complainants, and for which their judgments were obtained. Upon an execution issued upon Corwin's judgment he was arrested, and thereupon applied for the benefit of the insolvent laws, and after much litigation and delay, he was at length discharged as an insolvent debtor. When he rented the mill, he had little if any property, besides the house and lot at Bloomfield and his household furniture there. He had no capital or means, even to buy the ne-

cessary stock for the purpose of manufacturing paper and carrying on the mill, for he bought it on credit, or with money raised on notes, indorsed for him, or lent to him by others. In this situation he stood when about to commence business at the mill, under a lease for four years, at an annual rent of $960, besides payment of taxes, and cost of insurance, and the expenses of keeping the machinery and premises in repair. It was, to a man in his circumstances, an undertaking attended with some hazard, to say the least, and one in which he must certainly incur debts, in addition to his rent, and which, in case he should not be successful, he would have no means whatever to pay, except his property at Bloomfield. Yet, just before he executed that lease, and after he had agreed to take it, he began to take steps to convey away his house and lot, which, except his household goods, was all the property he had.

The deed from him to his son is dated 25th March, 1858, and it was, according to the certificate of acknowledgment indorsed upon it, acknowledged on the first of May following, by Reford and his wife. But Mr. McDonald, who drew the deed, and before whom the acknowledgment was taken, and who was called as a witness on the part of the defendants, says, that he thinks it was signed and acknowledged by Reford on the day it bears date, and that Mrs. Reford was not then present, but came afterwards and signed and acknowledged it on the first day of May, and that he then wrote the certificate of acknowledgment, the same as if they had both acknowledged it on that day. Mr. McDonald further says, that when he received instructions to draw the deed from Reford to his son, he was at the same time instructed to draw the deed from the son to Mrs. Reford, and was also directed to hold the deed to the son as an escrow, until Mrs. Reford signed it, and that he did so hold it until the first of May. The deed to the son was therefore not fully delivered, and did not operate as a conveyance until that time.

The deed from the son to his mother is dated on the third

of May, 1858, and was acknowledged the next day. Both deeds were recorded on the 17th of that month.

The testimony shows clearly, that about the time the deeds were delivered, and also afterwards, Reford represented to different persons with whom he was dealing, that he was the owner of the house and lot in question, and that it was clear of incumbrance, and he obtained credit, and accommodation indorsements, and discounts of notes, by that means. It seems to me, in view of the evidence, and of all the circumstances attending the transaction, that this is a plain case of a conveyance in view of future indebtedness on the part of Reford, and with an intent to place his property beyond the reach of his creditors, in case the business in which he was about to embark should be unsuccessful. Such a conveyance is fraudulent as against creditors, and will be set aside in this court. *Reade* v. *Livingston*, 3 *Johns. Ch. R.* 500; *Beeckman* v. *Montgomery*, 1 *McCarter* 106.

There is strong evidence of fraud upon the very face of the transaction, and without looking into the testimony which was offered, of the declarations made by Reford about the time he was preparing to lease the mill. Mr. Ehlers expressly states that Reford told him, about that time, that persons at Morristown advised him not to risk his property at Bloomfield in that undertaking, and that he ought to convey it to his wife. And Mrs. Reford, who was present at this conversation, expressed the same views, and wished to have the property conveyed to her, in order to put it beyond the risks of the business. And the witness says further, that about two months after that, they told him it had been done. This witness is, however, contradicted on this point as well as others, by both Reford and his wife, who were called and examined as witnesses for the defence, but under objection, made at the time, to their competency. I think that Reford was not a competent witness, and that his testi- mony must be excluded. He is testifying in favor of his wife in a civil suit, in which she is a party. The husband and wife cannot be witnesses for or against each other, where

either is a party in a civil suit. *Trenton Banking Co.* v. *Woodruff*, 1 *Green's Ch. R.* 131, and cases there cited ; *Bird* v. *Davis*, 1 *McCarter* 467.

The testimony of Mrs. Reford, it may be said, stands on a different ground, as she is testifying in her own behalf, in defence of her own claim to real estate, the title whereof is now vested in her, and in which her husband has no right or interest, unless it be as tenant by the curtesy initiate, which will be perfected only upon the contingency of his surviving her. Her testimony is objected to on other grounds. But I do not think it necessary to consider them, for even if her testimony be admitted, and its full force given to it in the particulars in which she contradicts Ehlers, I think that the other evidence in the case clearly shows that the conveyance to her by her husband, through her son, was in view of future indebtedness, and for the purpose of placing the property beyond the reach of creditors.

I am, therefore, of opinion that the conveyance from Reford to his son, and from the son to Mrs. Reford, should be declared to be fraudulent and void, and be set aside, and that the complainants' judgments should be declared to be liens upon the house and lot in question, and that the property should be sold to satisfy the amount due upon them respectively, (subject however to Mrs. Reford's right of dower,) and that it should be referred to a master to ascertain and state the amounts due upon the judgments respectively, and their order in regard to priority, and that further directions be reserved till the coming in of the report. And I respectfully recommend to the Chancellor to make an interlocutory order and decree accordingly.